**SUPERIOR COURT
OF THE
STATE OF DELAWARE**

PAUL R. WALLACE
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
(302) 255-0660

Date Submitted: March 11, 2022
Date Decided: May 31, 2022

Richard P. Rollo, Esquire
Travis S. Hunter, Esquire
Dorronda R. Bordley, Esquire
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware 19801

J. David Washburn, Esquire
Charles L. Perry, Esquire
KATTEN MUCHIN ROSENMAN LLP
2121 North Pearl Street, Suite 1100
Dallas, Texas 75201

David A. Crichlow, Esquire
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022

Garvan McDaniel, Esquire
HOGAN MCDANIEL
1311 Delaware Avenue
Wilmington, Delaware 19806

David S. Rosner, Esquire
Ronald R. Rossi, Esquire
Paul J. Burgo, Esquire
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019

Rebecca L. Butcher, Esquire
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801

William H. Gussman, Jr., Esquire
Andrew D. Gladstein, Esquire
George H. Rowe, Esquire
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022

RE:    *CRE Niagara Holdings, LLC, et al. v. Resorts Group, Inc.,*
       C.A. No. N20C-05-157 PRW CCLD

Dear Counsel:

The Court provides this Letter Opinion and Order in lieu of a more formal writing

to resolve:  (1) CRE's Motion to Dismiss (D.I. 96); (2) Cerberus's Motion to Dismiss (D.I. 95) (together with CRE's Motion, the "12(b)(6) Motions"); and (3) RGI's Renewed Motion for a Stay (D.I. 126) (the "Stay Motion").  For the reasons explained below, the 12(b)(6) Motions are **GRANTED, in part, AND DENIED, in part.** The Stay Motion is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. PROCEDURAL BACKGROUND.

The Court detailed the background of this case in its Memorandum Opinion dated April 7, 2021.[1]  Briefly stated, Plaintiff CRE Niagara Holdings, LLC, filed this action contesting its purchase of a resort and timeshare business (the "Resort") in 2017. CRE Niagara and its co-plaintiffs brought claims of fraudulent inducement, breach of contract, and declaratory judgment against Defendant Resorts Group, Inc. ("RGI"), alleging RGI made false representations in an effort to induce execution of the agreements that brought about the sale.

The Court denied RGI's motion to dismiss the First Amended Complaint in April 2021 and, in May 2021, denied RGI's motion for re-argument of that decision and its

---

[1]  *CRE Niagara Holdings, LLC v. Resorts Grp., Inc.*, 2021 WL 1292792 (Del. Super. Ct. Apr. 7, 2021).

separate motion for stay or enlargement of time.[2]  RGI then filed its Answer to the First Amended Complaint, Counterclaims, and a Third-Party Complaint.[3]  RGI filed its Amended Counterclaims and Third-Party Complaint on September 1, 2021.[4]

Plaintiffs/Counterclaim-Defendants CRE Niagara, LLC, Club Exploria, LLC, and CRE Niagara Participation Holdings, LLC, as well as Third-Party Defendants CRE Bushkill Group, LLC and CRE Echo Group, LLC (collectively, "CRE") moved to dismiss the Amended Counterclaims and Third-Party Complaint on September 30, 2021.[5]  Separately, Third-Party Defendants Cerberus Capital Management, L.P., Cerberus Partners II, L.P., Cerberus Institutional Real Estate Partners IV, L.P., CI II MF Echo, LLC, Cerberus Institutional Partners VI, L.P., CRE Niagara Management Holdings, LLC, and CRE Niagara Manager, LLC (collectively, "Cerberus") moved to dismiss the Third-Party Complaint.[6]

The Motions have been complicated by RGI's decision to initiate and maintain parallel proceedings in other jurisdictions.[7]  RGI first filed suit in the United States

---

[2]  *CRE Niagara Holdings, LLC v. Resorts Grp., Inc.*, 2021 WL 2110769 (Del. Super. Ct. May 25, 2021).

[3]  D.I. 81.

[4]  *See* RGI's Am. Countercl. and Third-Party Compl. (D.I. 92).

[5]  *See* CRE's Mot. to Dismiss (D.I. 96).

[6]  See Cerberus's Mot. to Dismiss (D.I. 95).

[7]  *See* RGI's Mot. to Dismiss Am. Compl. at 9–11 (D.I. 46) (detailing RGI's initiation of parallel litigation).

District Court for the Southern District of New York on May 18, 2020, shortly after CRE Niagara filed its complaint in Delaware. RGI also filed an action in the United States District Court for the District of Delaware on May 19, 2020. These federal actions were dismissed on jurisdictional grounds in August 2020. On August 12, 2020, RGI refiled in the Supreme Court of the State of the New York (the "New York court" and "New York Action").

In its Amended Counterclaims and Third-Party Complaint, RGI explained that it "separately filed the claims herein" in New York.[8] RGI asserted that its claims "should proceed in the New York Action in accordance with mandatory forum-selection [sic] and that this Court is an improper and inconvenient forum."[9] RGI nevertheless filed its claims in this Court "in the event that the New York court rules on the Cerberus-CRE Defendants' motions to dismiss . . . that RGI's claims should be brought before this Court and to the extent RGI is required to file them with its answer under Del. Super. Ct. R. 13."[10]

On December 27, 2021, the New York court issued a decision resolving motions to dismiss that CRE and Cerberus filed in the New York Action.[11] The parties then

---

[8] RGI's Am. Countercl. and Third-Party Compl. at 2 n.1.

[9] *Id.*

[10] *Id.*

[11] *See* Letter Transmitting New York Supreme Court Decision and Order, Dec. 30, 2021, Ex. A (D.I. 109).

filed supplemental briefing in this Court concerning the effect of the New York decision on the pending 12(b)(6) Motions.[12] RGI's supplemental brief alluded to the possibility of RGI filing for a stay,[13] and RGI filed its Stay Motion on February 4, 2022.[14] RGI explained that the Stay Motion raised the same arguments as its supplemental brief and that it filed the Stay Motion "to the extent that the Court believes that a motion, and an opportunity to respond, is necessary."[15]

The Court heard argument on the three pending motions on different dates and took them all under advisement after the final hearing.[16]

## B. RGI'S AMENDED COUNTERCLAIMS AND THIRD-PARTY COMPLAINT.

RGI's Amended Counterclaims and Third-Party Complaint encompass 176 pages, 445 paragraphs, and eleven causes of action. RGI's core contention is that Cerberus and CRE did not adhere to RGI's past practices in operating the Resort after they acquired it, as required by various transaction documents, nor did they ever intend to.[17] Instead, Cerberus and CRE allegedly acquired the Resort with the goal of looting its resources to enrich Cerberus and another timeshare company that CRE owned, Club

---

[12]   *See* RGI's Supp. Br. (D.I. 120); Cerberus's Supp. Br. (D.I. 121); CRE's Supp. Br. (D.I. 122).

[13]   *See* RGI's Supp. Br. at 2 n.2.

[14]   RGI's Renewed Mot. for a Stay (D.I. 126)

[15]   *See id.* at 1 n.1.

[16]   D.I. 131; D.I. 135.

[17]   RGI's Answering Br. at 1–2 (D.I. 105).

Exploria.[18]  As a result of these breaches, RGI's interest in the Payment Stream from the Resort's existing contracts with its timeshare members (the "Portfolio") has allegedly lost most of its value.[19]

RGI's story begins with Cerberus fraudulently inducing RGI into the transaction. Cerberus allegedly promised RGI that it would use the Resort as the headquarters of subsequent timeshare acquisitions.[20]  RGI claims that Cerberus's true intention was to gut the Resort's infrastructure and turn over operations to Club Exploria.  RGI claims Cerberus made these misrepresentations because RGI would have never otherwise agreed to the transaction.

The transaction involved three initial agreements between RGI and two subsidiaries of Cerberus, CRE Bushkill and CRE Niagara.[21]  First, RGI sold its equity in CRE Bushkill to CRE Niagara under the UAPA.  The UAPA provided that CRE Niagara would continue RGI's past practices to incentivize Portfolio members to continue making payments.  Second, the SA governed how the Resort would be run and how the Portfolio would be serviced.  Third, the PA assigned a minority portion of RGI's interest in the pre-acquisition Portfolio to a Cerberus-designated "Holder,"

---

[18]  *Id.*

[19]  *Id.* at 2.

[20]  *Id.*

[21]  *Id.* at 8–9.

initially CRE Bushkill. This included RGI's existing contracts for the timeshares in the Villas at Tree Tops (the "TreeTops Contracts") and Fairway (the "Fairway Contracts," together the "Timeshare Agreements"). Among other things, the PA required the Holder to follow past practices, continue to provide members with use and enjoyment of the Resort, and placed a cap on fee increases.

RGI claims Cerberus put its plan into motion immediately after closing. Cerberus allegedly caused CRE to breach the UAPA, SA, and PA by:

1. Cancelling approximately $20 million in members' contracts and failing to take contractually required steps to stem cancellations (like offering "downgrades");

2. Abandoning RGI's past practices and enumerated Servicing Procedures;

3. "[P]rioritizing their own receivables," including by engaging in fraudulent sales practices and denying member access to amenities and reservations;

4. Failing to provide members with the use, enjoyment, and service to which they were entitled and had previously been provided; and

5. Firing substantially all the Resort's personnel, thereby worsening service and driving away members.[22]

RGI claims these breaches led to "significant defaults and a corresponding erosion in Portfolio value."[23] RGI says it regularly demanded that the CRE-Cerberus entities cure the breaches, but to no avail.

---

[22] *Id.* at 12–13 (D.I. 105).

[23] *Id.* at 13.

In late 2018, Cerberus asked RGI to take a $3 million advance against a Hypothecation Loan, secured by the Portfolio, which RGI was required to split with CRE Participation.[24] Cerberus allegedly wanted these funds so that CRE Participation could "gift" them to Exploria. RGI initially refused. But then Cerberus made additional promises, including to restore RGI's "Profit Recovery" program. This would obligate the Counterclaim-Defendants to seek to settle or reinstate defaulting members' contracts and thereby reduce the shortfall to RGI. Later, RGI allegedly would learn that Counterclaim-Defendants "materially omitted that they had no intention of doing so inasmuch as they had already intentionally re-registered the cancelled inventory in Exploria's name, which prevented CRE from reinstating the members."[25]

CRE and RGI entered into the First Supplemental Agreement ("FSA") in December 2018.[26] The FSA provided that CRE would keep personnel in Bushkill and not terminate anyone without RGI's consent. But by February 2019, Counterclaim-Defendants allegedly announced their intention to outsource certain additional functions. RGI consented on the condition that Counterclaim-Defendants again promise to keep "all Collections and Customer Service in Bushkill."[27]

---

[24] *Id.* at 13–14.

[25] *Id.* at 14.

[26] *Id.*

[27] *Id.*

Cerberus requested that RGI take out another loan advance in April 2019.[28] When RGI refused, Cerberus allegedly threatened to recalculate the proceeds it owed to RGI and impose a special assessment on Portfolio members. RGI relented, with Cerberus again promising to cure its breaches and reintroduce the Profit Recovery program. The parties entered the Second Supplemental Agreement ("SSA") and took out the loan advance.[29]

RGI was "forced" to issue default notices in November 2019, December 2019, and January 2020.[30] As retaliation, CRE allegedly shut down over 100 units, terminated the entire financial and customer services departments in Bushkill, and cut off all contractually required communications with RGI.[31] Litigation between the parties began shortly thereafter, in May 2020.

Cerberus and CRE imposed the Special Assessment in September 2020, which Club Exploria claimed necessary to cover maintenance shortfalls.[32] RGI objected, contending RGI's past practices and the Timeshare Agreements required Exploria to cover the shortfalls itself. The Special Assessment allegedly resulted in member fees

---

[28]  *Id.* at 15.

[29]  *Id.*

[30]  *Id.*

[31]  *Id.*

[32]  *Id.* at 15–16.

totaling approximately 157% of the prior year, exceeding the cap of 110% imposed by the PA and Timeshare Agreements.

Counts I–VI of the Amended Counterclaims and Third-Party Complaint are breach-of-contract and implied covenant claims brought against various CRE entities.[33] Count I is a claim for "Breach of the UAPA/Indemnification" against CRE Niagara. RGI alleges CRE Niagara breached the UAPA through a wide range of activities discussed in greater detail below. Counts II–V are breach-of-contract claims against various CRE entities relating to their alleged breaches of the SA, PA, FSA, and PSQ Agreement. Count VI claims CRE also breached the implied covenant of good faith and fair dealing with respect to the contracts listed previously. Counts VII–XI are tort claims brought against Cerberus, alleging tortious interference with contract, fraudulent inducement, and civil conspiracy.[34]

## C. THE NEW YORK COURT'S TREATMENT OF RGI'S CLAIMS.

In its Amended Counterclaims and Third-Party Complaint, RGI represented that it had "separately filed the claims herein" in New York.[35] But RGI's claims generally did not fare well there. The New York court dismissed RGI's claim for breach of the UAPA for lack of venue "based on the broad Delaware forum clause contained in that

---

[33] RGI's Am. Countercl. and Third-Party Compl. at ¶¶ 325–97.

[34] *Id.* at ¶¶ 397–445.

[35] RGI's Amend. Countercl. and Third-Party Compl. at 2 n.1.

agreement."[36]  It dismissed RGI's fraud claim "without prejudice to moving for leave to replead if specific facts can be alleged showing that the breaches were intended at the time of contracting and a clear indication of which defendant made each alleged misrepresentation."[37]  And it dismissed the tortious interference claims "based on the economic-interest doctrine and because the complaint does not allege how a particular non-contracting CRE Defendant caused the contracting party to breach or why it was the but-for cause of the breach."[38]  The only claims to survive dismissal were the breach-of-contract claims corresponding to the SA, PA, FSA, and PSQ Agreement.[39]

## II. LEGAL STANDARD

A party may move to dismiss under this Court's Civil Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[40]  In resolving a Rule 12(b)(6) motion, the Court (1) accepts as true all well-pleaded factual allegations in the complaint; (2) credits vague allegations if they give the opposing party notice of the claim; (3) draws all reasonable factual inferences in favor of the non-movant; and (4) denies dismissal if recovery on the claim is reasonably conceivable.[41]  The Court need not

---

[36]  Letter Transmitting New York Supreme Court Decision and Order, Dec. 30, 2021, Ex. A at 2.

[37]  *Id.* at 3.

[38]  *Id.* at 4.

[39]  *Id.* at 2.

[40]  Del. Super. Ct. Civ. R. 12(b)(6).

[41]  *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

"accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[42]  Nor must the Court adopt "every strained interpretation of the allegations" the claimant proposes.[43]  Still, even with those cautions in mind, Delaware's pleading standard is "minimal."[44]  Dismissal is inappropriate unless "under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[45]  Indeed, "[i]f any reasonable conception can be formulated to allow [a claimant's] recovery, the motion must be denied."[46]

Each of these well-established rules that the Court applies to a suit-initiating plaintiff's claims are of equal utility when assessing an answering defendant's (*i.e.*, counterclaim-plaintiff's) counterclaims.[47]

---

[42]  *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[43]  *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[44]  *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 895 (Del. 2002)).

[45]  *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1023 (Del. Super. Ct. 2021) (internal quotation marks omitted); *see Cent. Mortg.*, 27 A.3d at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility . . . .'").

[46]  *Vinton v. Grayson*, 189 A.3d 695, 700 (Del. Super. Ct. 2018) (citing *Cent. Mortg. Co.*, 27 A.3d at 535).

[47]  *inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, 2021 WL 252823, at *4 (Del. Super. Ct. Jan. 26, 2021).

### III. PARTIES' CONTENTIONS

The parties' contentions have become numerous and must be distilled from: (1) CRE's and Cerberus's separate motions to dismiss, RGI's omnibus answering brief thereto, and both movants' reply briefs in further support of their motions; (2) all three parties' supplemental briefs; (3) RGI's Renewed Motion for a Stay and CRE's opposition; and (4) two full rounds of oral argument. At this stage, a full summary of the parties' contentions—for the parties as audience—wouldn't be particularly helpful. So the Court will instead summarize the parties' general positions and detail specific arguments as they become relevant to the analysis.

Succinctly stated, Cerberus and CRE argue that RGI's claims fail on their merits because RGI does not adequately plead facts supporting each element of those claims. Through its supplemental briefing, CRE argues the tortious interference claims should be dismissed also based on "res judicata (privity) and/or collateral estoppel"[48] in light of the New York decision. Cerberus, for its part, urges this Court to follow the New York court's reasoning with respect to the claims against it. Moreover, Cerberus says RGI should be held to its representation that it filed its claims in this Court only to preserve its rights to the extent the New York court dismissed the claims on *forum non conveniens* grounds.

---

[48] CRE's Supp. Br. at 5.

Conversely, RGI argues it has adequately pleaded facts supporting each of its claims in this Court. In a refrain that has become familiar, RGI suggests the Court's response to the New York ruling that has now been rendered rather than predicted should be "to stay the non-UAPA claims in the interest of comity to avoid inconsistent judgments and conserve resources."[49]

## IV. DISCUSSION

As explained below, RGI adequately states a claim for breach of the UAPA (Count I) and breach of the implied covenant of good faith and fair dealing with respect only to the UAPA (Count VI). Accordingly, Count I survives and Count VI survives to the extent it concerns the UAPA. But the claims for breach of the SA, PA, FSA, and PSQ Agreement (Counts II–V) are barred under RGI's prior representations to the Court, as is the implied covenant claim to the extent it concerns those non-UAPA contracts. Counts VII and VIII fail to state claims for tortious interference with contract. Counts IX and X fail to state claims for fraudulent inducement. And Count XI fails to state a claim for a civil conspiracy.

### A. THE UAPA CLAIM SURVIVES (COUNT I)

Count I alleges CRE breached the UAPA by: (i) failing to provide the Tree Tops Purchasers and Fairway Purchasers with the use and enjoyment to which they are

---

[49] RGI's Supp. Br. at 1.

entitled under those agreements in violation of UAPA Section 6.11(a); (ii) failing to maintain and operate the Villas in a manner that was, at minimum, materially equivalent to how RGI operated the Villas before closing in violation of UAPA Section 6.11(b); (iii) failing to provide the Tree Tops and Fairway Purchasers with customer service at an overall level of quality that was, at a minimum, materially equivalent to that provided by RGI prior to closing in violation of UAPA Section 6.11(c); (iv) failing to "continue to maintain and operate [the Resort] in a manner that is at a minimum materially equivalent to how [it was] being maintained and operated by [RGI] as of the Closing Date;" and (v) failing to provide the demanded information necessary to permit RGI to review and consent to the Proposed Special Assessment.[50]  RGI then provides a long list of specific conduct that it claims constitutes the breaches.[51]

### 1.  The "Materially Equivalent" Claim Survives.

CRE argues Count I should be dismissed insofar as it alleges breaches of UAPA Sections 6.11(b) and 6.11(c) because RGI has not adequately alleged "how or why the changes about which it complains were *material* changes in operations or services."[52]

Not so.  RGI raised detailed factual allegations concerning the "important[ce]" and materiality of RGI's past practices, including how they induced members to enter

---

[50]  *See* RGI's Am. Countercl. and Third-Party Compl. at ¶ 327.

[51]  *See id.* at ¶¶ 328–35.

[52]  CRE's Mot. to Dismiss at 13–14 (emphasis in original).

into Timeshare Agreements and continue to pay.[53]  RGI alleged that CRE's deviation from these practices caused collections to fall short of the parties' negotiated projections.[54]  Moreover, RGI alleged that CRE's changes caused customer satisfaction to decline and complaints to increase, with at least one longtime customer directly citing CRE's practices as the reason she "stopped paying."[55]

Materiality "is difficult to treat as a question of law on a motion to dismiss . . . They are matters that in many instances require a rich factual context to responsibly decide."[56]  At this stage, it is reasonably conceivable that RGI could prove CRE failed to operate the Villas in a manner materially equivalent to how RGI operated them and that CRE failed to provide materially equivalent service to members.  That is enough to deny CRE's motion with respect to the parts of Count I relating to Section 6.11(b) and 6.11(c) of the UAPA.

### 2. The "Use and Enjoyment" Claims Survive.

CRE argues Count I should be dismissed insofar as it alleges breach of UAPA Section 6.11(a), which required CRE to provide the Tree Tops Purchasers and Fairway

---

[53]  *See* RGI's Am. Countercl. and Third-Party Compl. at ¶¶ 52–59, 87–93, 158–64, 173–79, 196, 211–20.

[54]  *See id.* at ¶¶ 78–81, 147, 201–02.

[55]  *See id.* at ¶¶ 215–19.

[56]  *Wells Fargo Co. v. First Interstate Bancorp*, 1996 WL 32169, at *1 (Del. Ch. Jan. 18, 1996); *see also Malca v. Rappi, Inc.*, 2021 WL 2044268, at *4 (Del. Ch. May 20, 2021) ("'[M]ateriality' in the breach of contract context raises predominantly a question of fact.").

Purchasers "under their respective Timeshare Agreements all of the rights, title, access, services, reservations, use and enjoyment to which they are entitled thereunder."[57] CRE notes that RGI attached "sample" Timeshare Agreements as exhibits to its Counterclaims.[58] But CRE contends that the Counterclaims "do not identify any obligation of the CRE Defendants under any of the sample contracts that was allegedly breached."[59] Additionally, CRE argues that the sample Timeshare Agreements "contractually permitted [CRE] to do what RGI now claims was a breach."[60] CRE then addresses each specific instance of conduct that RGI identified as a breach.

First, CRE addresses RGI's claims that CRE "cut[] resort amenity availability and hours," "restrict[ed] permissible forms of payment," and conducted "massive Unit shut-downs."[61] CRE argues this conduct could not constitute a breach because the Timeshare Agreements provide that use of amenities is subject to "restrictions and costs" and "rules and regulations established by Resort management."[62] CRE's position is that its alleged breaches fall within these safe harbors. Although CRE may be right, it would not be appropriate for the Court to decide this issue at the pleadings stage.

---

[57] RGI's Am. Countercl. and Third-Party Compl., Ex. C at § 6.11.

[58] *See id.*, Exs. H and I.

[59] CRE's Mot. to Dismiss at 7.

[60] *Id.* at 8.

[61] *Id.*

[62] *Id.* at 8–9.

The UAPA required CRE to provide "all of the rights, title, access, services, reservations, <u>use and enjoyment</u>" guaranteed under the Timeshare Agreements. The question of whether an owner has been deprived of the "use and enjoyment" of their property appears to be a fact-intensive inquiry unfit for resolution at the pleadings stage.[63] For now, it is reasonably conceivable that RGI could show CRE's changes in operations were sufficiently intrusive to deprive Tree Tops Purchasers and Fairway Purchasers of the use and enjoyment of their units, even though the Timeshare Agreements allow for some restrictions, rules, and regulations. That is enough to survive dismissal.

Second, CRE targets RGI's allegation that CRE "curtail[ed] membership referral and owner rental programs."[64] CRE argues that the Timeshare Agreements do not require the operator to provide such services; instead, they state that the operator has entered into an agreement with an "independent exchange company" to provide them.[65]

---

[63] *See, e.g.,* RESTATEMENT (SECOND) OF TORTS § 821D (1979) ("'Interest in use and enjoyment' . . . comprehends the pleasure, comfort and enjoyment that a person normally derives from the occupancy of land."); *see id.* § 821F ("Rights and privileges as to the use and enjoyment of land are based on the general standards of normal persons in the community . . . .").

[64] CRE's Mot. to Dismiss at 10.

[65] *See* RGI's Amended Counterclaims and Third-Party Complaint, Ex. H at ¶ 15 ("Tree Tops does not, however, operate a rental service for its members."); *see id.* at ¶ 13 ("Tree Tops has entered into a contract with an independent exchange company" but "DOES NOT AND CAN NOT MAKE ANY REPRESENTATIONS CONCERNING CURRENT OR FUTURE SERVICES TO BE PROVIDED BY AN INDEPENDENT EXCHANGE COMPANY."); *see id.,*

In CRE's view, the Timeshare Agreements disclaim any obligation by the operator to maintain this service. But reasonable minds could disagree with CRE's interpretation of the Timeshare Agreements. Although CRE is correct that the Timeshare Documents state the operator does not provide a rental service, they also state that each purchaser "ha[s] the option to continue in the exchange program on a year to year basis."[66] This "option" would be a nullity unless the operator were required to ensure that the exchange program *actually exists* on a year to year basis. Thus, the Timeshare Agreements reasonably could be interpreted as requiring the operator to maintain its agreement with the independent exchange company. CRE's argument for dismissal therefore falls short.

Third, CRE targets RGI's claim that CRE "mad[e] it difficult to obtain reservations."[67] CRE points out that although the Timeshare Agreements provide purchasers "the right to reserve an Interval in its applicable season," "there are no guarantees that you can reserve a specific Interval or specific Unit."[68] Additionally, the Timeshare Agreements provided that "Villa usage is subject to Seller's reservation

---

Ex. I at ¶ 26 ("Seller has made no provisions for assisting in the resale of the Villa, nor will seller repurchase the Villa from Purchaser).

[66]   *See id.*, Ex. H at ¶ 13.

[67]   CRE's Mot. to Dismiss at 11.

[68]   *See* RGI's Am. Countercl. and Third-Party Compl., Ex. H at ¶ 6.

policies and procedures."[69]  Thus, CRE's argument is that any changes it made to the Resort's reservation policies were contractually permitted.  But this argument is not entirely persuasive.

Again, the UAPA required CRE to provide members their "rights, title, access, services, reservations, and use and enjoyment" under the Timeshare Documents.  It is true that the Timeshare Agreements allow for certain restrictions to a purchaser's access, services, and reservations.  But one can't reasonably  interpret the Timeshare Agreements as allowing such restrictions to be made unreasonably or in bad faith, as RGI claims.[70]  Moreover, even if purchasers were not entitled to a "specific" unit or "specific Interval," they still "have the right to reserve *an Interval* in its applicable season."[71]  Therefore, RGI can state a claim for breach of the UAPA by alleging, as it did, that CRE interfered with the ability of purchasers to make reservations.

Finally, CRE addresses RGI's claim that CRE "increase[ed] maintenance fees and late payment charges."[72]  CRE points out that the one of the two Timeshare Agreements does not expressly address maintenance fees and states that "[l]ate charges

---

[69]  *Id.*, Ex. H at ¶ 6.

[70]  *See id.* at ¶ 330 ("Any general disclaimers in the Timeshare Agreements that purportedly state that these obligations are subject to certain rules and restrictions do not negate CRE Niagara's breaches which unreasonably withheld the entirety of these benefits from members above and beyond any safety rules of Resort protocols.").

[71]  *See* RGI's Am. Countercl. and Third-Party Compl., Ex. H at ¶ 6 (emphasis added).

[72]  CRE's Mot. to Dismiss at 4.

will be assessed at the highest rates allowable by law;" meanwhile, the other Timeshare Agreement doesn't speak to either fees or late charges.[73]   Therefore, CRE appears to suggest that there is no contractual provision it could have breached.

CRE's argument speaks past RGI's actual allegations.   One Timeshare Agreement provided that the operator would not increase the yearly "maintenance fee" by more than 10% from year to year;[74] the other provided that the operator would not increase annual "membership dues" by more than 10% from year to year.[75]   Thus, the two types of Timeshare Agreements appear to use "membership dues" and "maintenance fee" interchangeably.   And RGI's claim is that CRE breached these provisions by imposing a Special Assessment on members that raised their required payments by more than the 10% limit.[76]   The Special Assessment could reasonably be interpreted as raising the "maintenance fee" by more than 10% because CRE itself justified the Special Assessment as necessary to cover costs associated with maintenance issues.[77]   Alternatively, the Special Assessment could reasonably be interpreted as raising "membership dues" by more than 10% because members were

---

[73]   *Id.* at 13.

[74]   RGI's Am. Countercl. and Third-Party Compl., Ex. I at ¶ 3.

[75]   *Id.*, Ex. H at 1.

[76]   *See id.* at ¶¶ 306–24 (explaining the circumstances and amount of the Special Assessment).

[77]   *See id.* at ¶ 306.

required to pay the Special Assessment to continue using their Villas. Therefore, it is reasonably conceivable that RGI could show CRE breached one or both types of Timeshare Agreements by imposing the Special Assessment on members. In short, the Court cannot find CRE is due dismissal on any of CRE's arguments relating to its obligations under Section 6.11(a) of the UAPA.

### 3. CRE's Damages Argument Fails.

CRE briefly argues RGI has not adequately alleged damages resulting from the alleged breaches of the UAPA.[78] CRE acknowledges that RGI seeks damages of "not less than $30 million" across its eleven counts. But CRE contends RGI has not explained how its alleged damages could result "from the absence of information, reports or certificates, even if they were not provided."[79] CRE apparently refers to RGI's claim that CRE breached the UAPA by "failing to provide the demanded information necessary to permit RGI to review and consent to the Proposed Special Assessment."[80] Additionally, CRE suggests that RGI's alleged damages are not "logically and reasonable related to the harm or injury for which compensation is being awarded."[81] In other words, CRE's position is that RGI has not alleged facts supporting

---

[78]  CRE's Mot. to Dismiss at 15–16.

[79]  *Id.* at 15.

[80]  *See* RGI's Am. Countercl. and Third-Party Compl. at ¶ 327.

[81]  CRE's Mot. to Dismiss at 15–16 (quoting *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 776, 773 (Del. 2006)).

"its conclusory claim of damages exceeding the same $30 million for each count."

CRE's argument fails for two reasons. First, CRE simply recites general rules of law regarding damages and then asserts, in conclusory fashion, that RGI has not satisfied them. But CRE provides authority establishing that a plaintiff must plead damages in just the particular manner CRE envisions. Second, in Delaware, a plaintiff "need not allege an exact monetary figure in order to sufficiently plead that it suffered damages from [a] breach of contract."[82] Furthermore, Delaware courts have consistently held that plaintiffs suffer a legally cognizable injury when they are not provided with information to which they are contractually entitled.[83] Therefore, RGI has sufficiently pleaded that each alleged breach of the UAPA caused RGI to suffer a legally cognizable injury. And while RGI has not provided a detailed accounting of how the damages associated with these breaches adds up to $30 million, Delaware law doesn't require it to.

In short, RGI has adequately pleaded a claim against CRE for breach of the UAPA. CRE's 12(b)(6) Motion is therefore **DENIED** as to Count I of the Amended Counterclaims and Third-Party Complaint.

---

[82] *Weyerhaeuser Co. v. Domtar Corp.*, 61 F. Supp. 3d 445, 453 (D. Del. 2014).

[83] *See Heritage Handoff Holdings, LLC v. Fontanella*, 2019 WL 1056270, at *31-32 (D. Del. Mar. 6, 2019); *Great-West Invs. v. Thomas H. Lee Partners*, 2011 WL 284992, at *9 (Del. Ch. Jan. 14, 2011).

## B. THE NON-UAPA CONTRACT CLAIMS ARE DISMISSED WITH PREJUDICE (COUNTS II–V).

Counts II–V are breach-of-contract claims relating to the SA, PA, FSA, and PSQ Agreement. The Court need not reach CRE's arguments that these claims fail on their merits, as advanced in its 12(b)(6) Motion. Instead, RGI's own representations to this Court are sufficient to bar each claim.

In its Amended Counterclaims and Third-Party Complaint, RGI "maintain[ed] that its claims should proceed in the New York Action in accordance with mandatory forum-selection [sic] and that this Court is an improper and inconvenient forum."[84] Nevertheless, RGI filed its claims in this Court "in the event that the New York court rules on the Cerberus-CRE Defendants' motions to dismiss, which are now *sub judice*, that RGI's claims should be brought before this Court and to the extent RGI is required to file them with its answer under Del. Super. Ct. R. 13."[85] RGI thus informed the Court, in no uncertain terms, that it believed its claims belong in New York and that it filed them here only in case the New York court disagreed.

RGI's precautions proved unnecessary. The New York court found that the SA, PA, and FSA contained "broad mandatory New York forum selection clauses applicable to all claims related to these agreements," and although the PSQ Agreement

---

[84] RGI's Amend. Countercl. and Third-Party Compl. at 2 n.1.

[85] *Id.*

lacked such a clause, it was "related to the [SA]."[86]  The New York court determined that this "deliberate drafting decision must be given effect and the specific forum selection clauses at issue here choosing New York must be enforced"—otherwise, "those clauses would be rendered completely meaningless."[87]  Thus, the non-UAPA contract claims survived dismissal in the New York action.

So what should be done with the non-UAPA contract claims that RGI filed in this Court?  RGI says they should either be stayed or dismissed without prejudice under comity principles.[88]  Not so fast.  How does that further comity or judicial economy in any way.

RGI has done its utmost to avoid litigating this dispute in this Court, having filed actions in the District of New York, the District of Delaware, and now the New York Supreme Court.  RGI has filed several motions in this Court insisting that Delaware is an improper or inconvenient venue,[89] a claim it repeated in its Amended Counterclaims and Third-Party Complaint.  RGI's tactical maneuvering has finally borne fruit, with the New York court agreeing that the non-UAPA contract claims "must" be litigated in

---

[86]   Letter Transmitting New York Supreme Court Decision and Order, Dec. 30, 2021, Ex. A at 3.

[87]   *Id.*

[88]   *See* RGI's Supp. Br. at 3–5; *see generally* RGI's Stay Motion.

[89]   See RGI's Mot. to Dismiss at 12–18 (D.I. 11); RGI's Am. Mot. to Dismiss at 27–33 (D.I. 28); RGI's Mot. to Dismiss at 28–35 (D.I. 46); RGI's Mot. to Reargue (D.I. 71); RGI's Am. Mot. to Reargue (D.I. 76).

New York. RGI has gotten what it wanted; but now asks for more. Having derided—in at least two courts—any notion that it should be in this Court for any of this, RGI now asks to stay or dismiss without prejudice its non-UAPA contract claims, thus leaving this Court's door open to reenter if things don't go its way in New York. Yet, RGI gives no cogent reason why the Court should.

At this point, RGI's appeal to "comity" and economy rings rather hollow. RGI's efforts to avoid this forum have consumed the time and resources of four busy courts and created the very same risk of duplicative litigation and inconsistent judgments about which RGI now complains. Moreover, RGI represented that it filed its Amended Counterclaims and Third-Party Complaint just in case the New York court determined those claims belong in Delaware. The New York court didn't. Given RGI's maneuverings, it can and should be held to its prior representations—its non-UAPA contract claims can now be dismissed with prejudice so as to avoid any possible threat to comity, to judicial economy, or of inconsistent judgments. Too, dismissing these claims here is fidelitous to the caution the Court extended a year ago: "The Court will not rescue a party from its own strategy calls, nor will it give that party any advice on how to avoid its own litigation peril." [90]

In short, the non-UAPA contract claims are dismissed with prejudice based on

---

[90] *CRE Niagara Holdings, LLC v. Resorts Grp., Inc.*, 2021 WL 2110769, at \*7 (Del. Super. Ct. May 25, 2021).

RGI's previous representations to this Court; RGI may now prosecute those claims in New York as it sees fit. Accordingly, RGI's Stay Motion is **DENIED** and CRE's dismissal motion is **GRANTED** as to Counts II–V.

### C. THE IMPLIED COVENANT CLAIM SURVIVES AS IT RELATES TO THE UAPA (COUNT VI)

In Count VI, RGI alleges CRE breached its implied obligations under the SA, PA, UAPA, FSA, and PSQ Agreement.[91] It is tempting to simply declare certain parts of the implied covenant claim are dismissed with prejudice—*i.e.* those related to the non-UAPA contracts—for the reasons discussed in the previous section and leave the rest. "But at the pleading stage of a case, a trial judge is not a robed gardener employing Rule 12(b)(6) as a judicial shear to prune individual theories from an otherwise healthily pled claim or counterclaim."[92] And here the implied covenant claim survives to the extent RGI alleges CRE breached its implied obligations under the UAPA.[93]

---

[91]  *See* RGI's Am. Countercl. and Third-Party Compl. at ¶ 392.

[92]  *inVentiv Health Clinical*, 2021 WL 252823, at *4.

[93]  In practical terms, this means the Court no longer should nor will hear claims or arguments by RGI that CRE breached some implied covenant under the SA, PA, FSA, or PSQ Agreement. The Court holds RGI to its protestations that such claims should have never been here to begin with—and all can be confident they are now safely in the hands of the New York court for adjudication. *See* Letter Transmitting New York Supreme Court Decision and Order, Dec. 30, 2021, Ex. A at 2 ("The claims for breach of the implied covenant of good faith and fair dealing asserted as against the contracting parties and their successors by merger survive for now . . .").

RGI alleges CRE breached the implied covenant as to the UAPA by exercising its discretion to manage the Resort and perform collections "in bad faith to maximize their own personal profits while depriving RGI of the fruits of their contract."[94] "Among other things," CRE "used the Resort for lending for their own purposes instead of to maximize profits for the benefit of all parties" and "provided better service to members in the Club Exploria Program, who were not in the Participation Portfolio."[95]

CRE advances several arguments for dismissal in its 12(b)(6) Motion. First, CRE argues RGI has not identified any implied obligations that have been breached or any contractual gaps that must be filled.[96] Second, CRE argues there is no claim under the implied covenant because CRE was given discretion to manage the Resort after closing. Third, CRE argues RGI has not identified how using the Resort as collateral would contravene any implied obligations under the UAPA. Instead, CRE claims RGI is simply asking the Court to impose a term that RGI wishes it had bargained for, but failed to. The Court addresses these arguments in their reverse order.

CRE's third argument may well have merit. RGI has made no attempt to explain how CRE "us[ing] the Resort as collateral for lending" would breach any of CRE's obligations under the UAPA. It is not enough for RGI to claim that CRE used the

---

[94] RGI's Am. Countercl. and Third-Party Compl. at ¶ 393.

[95] *Id.*

[96] CRE's Mot. to Dismiss at 45.

Resort as collateral "for [its] own purposes instead of to maximize profits for the benefit of all parties."[97]  The UAPA did not require CRE to "maximize profits for the benefits of all parties"—instead, it simply required CRE to operate the Resort in accordance with RGI's past practices to protect RGI's interest in the Portfolio after closing.  Thus, this allegation alone does fail to state a claim for breach of the implied covenant relating to CRE's use of the Resort as collateral.

But CRE's second argument on Count VI fails.  The UAPA cannot be reasonably interpreted as leaving the management of the Resort solely to CRE's discretion.  Rather, the UAPA set limits on CRE's discretion by requiring CRE to honor its obligations under the existing Timeshare Contracts, to operate the Villas in a manner "materially equivalent" to how RGI operated them, and to provide customer service "materially equivalent" to that provided by RGI.  And even "[w]hen a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith."[98]  This alone is enough to save Count VI, though—given the ruling above—it form and effect may be pared down later effect via motions practice or jury instruction.[99]

---

[97]  RGI's Am. Countercl. and Third-Party Compl. at ¶ 393.

[98]  *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146–47 (Del. Ch. 2009) (internal citations omitted).

[99]  Again, deadheading these non-starter theories from an otherwise viable count in a complaint is not done via Rule 12(b)(6). *inVentiv Health Clinical*, 2021 WL 252823, at *4.

For completeness' sake, the Court also addresses CRE's first argument—that RGI's general allegations of bad-faith conduct were not sufficient to state a claim under the implied covenant. This issue is more difficult to assess. For the most part, RGI's claim that CRE exercised its discretion under the UAPA in bad faith appears to duplicate RGI's breach-of-contract claim in Count I. After all, RGI could demonstrate that CRE breached the UAPA simply by showing that CRE did not adhere RGI's past practices, regardless of whether CRE acted in good faith or in bad faith. That said, there appears at least one gap in the UAPA that the implied covenant could fill.

As detailed previously, the UAPA required CRE to provide Villa residents with the "rights, title, access, services, reservations, use and enjoyment to which they are entitled" under their Timeshare Agreements. But the Timeshare Agreements allow the operator to impose certain rules and regulations restricting the residents' rights, access, services, reservations, use, and enjoyment. RGI suggests an implied term of the UAPA is that CRE cannot create unreasonable rules and restrictions to alienate residents and therefore harm the Portfolio. Maybe so.

The agreements in this case were intended to protect RGI's interest in the Portfolio after closing. But that intent would be frustrated if CRE could use its rule-making authority to drive away Portfolio members and thereby harm the payment stream to RGI.

Accordingly, RGI has identified here again a potential gap for the implied

covenant to fill. And Count VI's survival also because it alleges, with reasonable conceivability, that CRE breached the implied covenant by exercising its authority to manage the Resort under the UAPA in bad faith.

### D. THE TORTIOUS INTERFERENCE CLAIMS FAIL (COUNTS VII & VIII)

Counts VII and VIII are claims for tortious interference with contract against Cerberus. Count VII alleges Cerberus "wrongfully procured" CRE to breach the UAPA, SA, PA, FSA, and PSQ Agreement.[100] As evidence, RGI cites Cerberus's "day-to-day control" over the CRE entities, that the breaches Cerberus procured were "to the detriment" of the CRE entities, and the "express assurances RGI obtained from Cerberus's agents that they were speaking on behalf of Cerberus and that Cerberus would, and could, assure the subsidiaries' compliance with the agreements."[101]

Count VIII is another claim for tortious interference with contract. The contracts at issue are the "thousands" of Timeshare Documents that Bushkill Group entered into with the Participation Portfolio Obligors before the transaction.[102] RGI alleges that Cerberus "by itself and through Club Exploria" procured the Participation Portfolio obligors' breach of those agreements by: (1) "informing Participation Portfolio obligors that they would lose their reservation priority unless they 'upgraded' to a membership

---

[100] RGI's Am. Countercl. and Third-Party Compl. at ¶ 401.

[101] *Id.* at ¶ 404.

[102] *Id.* at ¶ 409.

in the new Exploria Program"; (2) "denying them day use of the Resort as a threat to get Participation Portfolio obligors to 'upgrade' to the Exploria Program"; and, (3) "informing Participation Portfolio obligors that they were not entitled to the benefits they had previously enjoyed, and had contracted for, who instead of being forced to upgrade were more likely to cancel their contract."[103]   As evidence that Cerberus procured the breaches, RGI again cites Cerberus's day-to-day control over CRE, that the breaches Cerberus procured were to the detriment of RGI, and the express assurances RGI obtained from Cerberus's agents that they were speaking on behalf of Cerberus.[104]   RGI adds that it has standing to pursue a tortious interference claim because it is an intended beneficiary or third-party beneficiary of the Timeshare Documents.[105]

In its 12(b)(6) Motion, Cerberus argues that Counts VII and VIII simply recite the elements of a tortious interference claim without sufficient factual support.  First, Cerberus contends RGI has not alleged any "specific acts" by which Cerberus "procured" the alleged breaches.[106]  Instead, "RGI's allegations amount to an assertion that a parent corporation can be liable for tortious interference because it has some

---

[103]   *Id.* at ¶ 413.

[104]   *Id.* at ¶ 414.

[105]   *Id.* at ¶ 412.

[106]   Cerberus's Mot. to Dismiss at 11.

degree of control over the actions of its subsidiary."[107]  Second, Cerberus contends the economic interest doctrine independently bars RGI's tortious interference claim.[108] This doctrine requires that, when a defendant has an economic interest in the contract, a plaintiff must allege supporting facts that the defendant acted with malice or employed illegal means to procure a breach of that contract.  Cerberus contends RGI instead recited a conclusory allegation that Cerberus "acted wrongfully, illegally, with malice, and without justification or excuse."[109]   The problem, says Cerberus, is that RGI's allegations of malice don't involve any Cerberus entities, but rather conduct by Club Exploria.  Third, Cerberus argues that RGI's allegation of "but for" causation is conclusory; Count VII does not allege any specific action by Cerberus that could have caused the breaches, while Count VIII fails to identify which of the "thousands" of agreements were breached.[110]  Finally, Cerberus argues RGI lacks standing to bring Count VIII because RGI was neither a party nor an intended beneficiary of the Timeshare Agreements.[111]

---

[107]  *Id.* at 12.

[108]  *Id.* at 14–15.

[109]  *Id.* at 15.

[110]  *Id.* at 18.

[111]  *Id.* at 20.

### 1. RGI's cannot rely on Pennsylvania law.

The parties' briefing raises a choice-of-law issue. The UAPA contains a Delaware choice-of-law provision, while the SA, PA, FSA contain New York choice-of-law provisions. In its 12(b)(6) Motion, Cerberus argued that a choice-of-law analysis is unnecessary because the law of Delaware and New York on tortious interference with contract is substantially similar.[112] But then, oddly, RGI's answering brief argued for *Pennsylvania* law because Pennsylvania has the closest relationship to the contracts at issue.[113] RGI prefers Pennsylvania law because "Pennsylvania does not recognize an economic interest privilege for interference with existing, as opposed to prospective, contracts."[114] Cerberus's reply brief criticized RGI for ignoring the choice-of-law provisions and "transparently seeking to avoid the economic interest defense available under both Delaware and New York law."[115]

RGI cannot rely on Pennsylvania law to save this claim. RGI's argument entirely ignores the Delaware and New York choice-of-law provisions in the relevant contracts. Cerberus is correct to suggest that RGI is simply attempting to avoid an unfavorable result under Delaware and New York law, by eschewing the subject contract's express

---

[112] *Id.* at 9 n.5.

[113] RGI's Answering Br. at 61 n.23.

[114] *Id.* at 65.

[115] Cerberus's Reply Br. at 3.

choice-of-law provisions. The Court cannot.[116] And the Court need not choose between Delaware and New York law because the elements of a tortious interference claim are substantively identical between the states.

In Delaware, the elements are "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."[117] In New York, the elements are "(1) the existence of a valid contract between the plaintiff and a third party; (2) the 'defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom."[118] Additionally, both states recognize that corporate entities have a limited privilege to interfere with the operations of their affiliates and subsidiaries to protect their own economic interests.[119] In New York, this defense is available where the defendant sought to protect an economic interest in the breaching party's business and the plaintiff makes no showing

---

[116] *J.S. Alberici Constr. Co. v. Mid-W. Conveyor Co.*, 750 A.2d 518, 520 (Del 2000) ("Delaware Courts will honor a contractually-designed choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction" and the jurisdiction's laws are not "repugnant to the public policy of Delaware.").

[117] *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1266 (Del. 2004).

[118] *Horowitz v. Nat'l Gas & Elec., LLC*, 2018 WL 4572244, *5 (S.D.N.Y. Sept. 24, 2018) (internal quotations and citations omitted).

[119] *See id.* at *6; *Buck v. Viking Holding Mgmt. Co. LLC*, 2021 WL 673459, at *6 (Del. Super. Ct. Feb. 22, 2021).

that the defendant acted "maliciously, fraudulently, or illegally."[120]  In Delaware, the plaintiff must allege facts to rebut the presumption that the defendant was pursuing legitimate profit-seeking goals in good faith (*i.e.*, by showing that its *sole* motive in interfering was bad faith to injure the plaintiff).[121]  Given this similarity in law between the two jurisdictions, no choice-of-law analysis is necessary.[122]

### 2.  RGI's claims fail under both Delaware and New York law.

RGI's tortious interference claims fail in several respects.  First, RGI fails to adequately plead that Cerberus intentionally procured CRE to breach the relevant agreements.  RGI's only real support for this claim is its recitation that Cerberus "runs and controls the CRE Subsidiaries' day-to-day operations and is capable of and responsible for procuring breaches of the Agreement."[123]  But RGI cannot state a claim for tortious interference based on its Cerberus's *ability* to procure a breach of contract; RGI must plead facts showing that Cerberus *actually did* procure a breach of contract.[124]

---

[120]  *Horowitz*, 2018 WL 4572244, at *6.

[121]  *Buck*, 2021 WL 673459, at *6.

[122]  *See Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1162-65 (Del. 2010) (explaining that if the substantive law of the two jurisdictions is the same, then "there is a 'false conflict,' and the court should avoid the choice of law analysis altogether"); *Lagrone v. Am. Mortell Corp.*, 2008 WL 4152677, at *5 (Del. Super. Ct. Sept. 4, 2008) ("In such instances of 'false conflicts' of laws, the Court may resolve the dispute without a choice between the laws of the competing jurisdictions.")

[123]  RGI's Am. Countercl. and Third-Party Compl. at ¶ 145.

[124]  *See WaveDivision Holdings, LLC v. Highland Cap. Mgmt. L.P.*, 2010 WL 1267126, at *4 (Del. Super. Mar. 31, 2010) (dismissing a tortious interference claim where the complaint "simply states the elements required to plead a tortious interference claim without reference to the specific conduct that sets forth the allegations"); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 855 (Del.

RGI has nothing to offer in that regard. Instead, RGI relies on generalized and conclusory allegations to connect Cerberus with CRE's alleged breaches.

Second, RGI fails to adequately plead that Cerberus acted maliciously, fraudulently, or illegally. RGI attempts to show malice by claiming that Cerberus and Club Exploria "caused many of the breaches because of their personal animus toward RGI;"[125] from there, RGI describes the conduct of Tom Morris, an "agent" of Cerberus, who "made it clear, on numerous occasions, that he did not like RGI or its principals."[126] Mr. Morris's conduct allegedly included "criticiz[ing] RGI for not borrowing excessive amounts on the Participation Portfolio and on the Resort real estate."[127] Mr. Morris would later become CEO of Club Exploria.[128] Even if it were accepted that Mr. Morris spoke on Cerberus's behalf, his alleged statements are insufficient to support a reasonable inference that Cerberus acted with malice. Essentially, RGI rests its claim of malice on Mr. Morris's personal disagreement with RGI's approach to using

---

Ch. 2009) (dismissing claim for tortious interference because complaint contained no "*factual* allegations" supporting its claim that various individuals exceeded the scope of their authority) (emphasis in original); *Vandenberg, Inc. v. Townhouse 84, LLC*, 941 N.Y.S.2d 541, at *2 (N.Y. Sup. Ct. 2011) ("By itself, the conclusory allegation of interference with plaintiff's brokerage agreement fails to allege what actions the moving defendants took that procured defendant seller's breach of the agreement and thus is insufficient to plead the tortious interference claim.").

[125] RGI's Am. Countercl. and Third-Party Compl. at ¶ 284.

[126] *Id.*

[127] *Id.*

[128] *Id.* at ¶ 65.

leverage. That is hardly enough to reasonably infer that Cerberus's "*sole* motive" in for its purported interference was "bad faith to injure" RGI.[129]

Third, RGI does not adequately allege that Cerberus's alleged interference was the cause of CRE's alleged breaches. Again, RGI has not credibly alleged that Cerberus took any action to cause or procure the breaches. A necessary consequence is that RGI cannot credibly allege that Cerberus's conduct was a significant factor in causing the breaches.

Because RGI has failed to state a claim for tortious interference, it is unnecessary for the Court to assess Cerberus's argument that RGI lacks standing to pursue the tortious interference claim in Count VIII. Additionally, the Court need not decide whether the tortious interference claims are barred under *res judicata*, as Cerberus and CRE suggested in their supplemental briefing.

Cerberus's 12(b)(6) Motion is **GRANTED** as to Counts VII and VIII because those counts fail to state a claim under the reasonable conceivability standard the Court must apply thereto.

### E. THE FRAUDULENT INDUCEMENT CLAIMS FAIL (COUNTS IX AND X)

RGI brings two claims for fraudulent inducement. Count IX alleges that

---

[129] *Buck*, 2021 WL 673459, at *6 (emphasis in original).

Cerberus fraudulently induced RGI to enter into the UAPA, SA, and PA.[130] RGI claims that Cerberus falsely represented that it was purchasing Bushkill Group to make its offices and data center the "Corporate Headquarters" of its timeshare holdings and that it would complement the Resort through a subsequent timeshare acquisition. Cerberus allegedly wanted RGI to rely on these statements so that it would sell Cerberus its equity interest in Bushkill Group, which Cerberus could then siphon to grow Club Exploria.

Count X alleges Cerberus and Club Exploria fraudulently induced RGI to enter into the Supplemental Agreements and take two loan advances in connection with the Supplemental Agreements, totaling $9 million.[131] RGI claims Cerberus and Club Exploria made two sets of false representations in relation to these agreements. First, in December 2018, Cerberus and Club Exploria allegedly represented that they would reinstate the Profit Recovery program if RGI agreed to enter into the loan agreement, restore amenity hours and members access, resume helping members with the Exchange Program, re-create the link between Financial Services and Reservations, and re-authorize different departments at the Resort to work with each other. Second, in July 2019, Club Exploria's Executive Vice President allegedly made similar representations to induce RGI to borrow more. Cerberus and Club Exploria allegedly knew that they

---

[130] RGI's Am. Countercl. and Third-Party Compl. at ¶¶ 419–26.

[131] *Id.* at ¶¶ 427–39.

would not and could not keep those promises. Additionally, Count X alleges that Cerberus, Club Exploria, and CRE Participation fraudulently induced RGI to enter into the Transaction Agreements and Joinder by falsely representing that any obligations under the PA could be performed by any assignee.

In its 12(b)(6) Motion, Cerberus first argues that RGI has not pleaded sufficient facts to support its conclusion that the alleged promises were never intended to be performed. Cerberus acknowledges that a plaintiff can state a claim for fraudulent inducement by showing that the defendant had an actual present intent not to perform on its promises. But, says Cerberus, RGI hasn't alleged any facts showing that Cerberus never intended to honor its promises. Instead, RGI alleges only in a conclusory fashion that Cerberus knew the alleged representations were untrue when made. Second, Cerberus argues that RGI cannot establish reasonable reliance because the Transaction Agreements contained merger clauses. Third, Cerberus argues that RGI failed to plead Count X with particularity because it does not allege that anyone acting on behalf of Cerberus made any false statements. As explained below, Cerberus's first and third arguments prevail and the Court need not reach the second.

The elements of a fraudulent inducement claim are: (1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) the

plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damages to the plaintiff as a result of such reliance.[132] A claim for fraudulent inducement must be pled with particularity in accordance with Rule 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."[133]

Here, RGI argues CRE never intended to honor its promises when they were made and cites Rule 9(b) for the proposition that such averment of intent is enough. Not so.

"[W]hen a plaintiff pleads a claim of promissory fraud, in that the alleged false representations are promises or predictive statements of future intent rather than past or present facts, the plaintiff must meet an even higher threshold. In this situation, the plaintiff 'must plead *specific facts* that lead to a reasonable inference that the promisor had no intention of performing at the time the promise was made.'"[134] New York imposes a similar requirement: "To fulfill the element of misrepresentation of material fact, the party advancing the claim must allege a misrepresentation of present fact rather

---

[132] *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *21 (Del. Ch. Apr. 21, 2015).

[133] *Id.* (internal citations omitted).

[134] *Id.* (quoting *MicroStrategy Inc. v. Acacia Rsch. Corp*, 2010 WL 5550455, at *15 (Del. Ch. Dec. 30, 2010)).

than of future intent. General allegations of lack of intent to perform are insufficient; rather, facts must be alleged establishing that the adverse party, at the time of making the promissory representation, never intended to honor the promise."[135]

RGI's factual allegations do not satisfy this standard. Count IX offers no support for its allegation that Cerberus knew its representations were false as it was making them. And Count X only weakly claims that the falsity of the promises "is made clear by the Cerberus-CRE Defendants' subsequent and immediate breach" of the Supplemental Agreements.[136] However, the mere fact that a party did not follow through on its promise is not sufficient to state a claim for fraudulent inducement. "Delaware law holds that a plaintiff 'cannot bootstrap a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations.'"[137] New York law is similar: "[A]ny inference drawn from the fact that the expectation did not occur is not sufficient to sustain the plaintiff's burden of showing that the defendant falsely stated his intentions."[138]

What's more, Count X does not plead with particularity that anyone representing

---

[135] *Perella Weinberg Partners LLC v. Kramer*, 58 N.Y.S.3d 384, 390 (N.Y. App. Div. 2017) (internal citations and quotations omitted).

[136] RGI's Am. Countercl. and Third-Party Compl. at ¶ 434.

[137] *CHS Theatres*, 2015 WL 1839684, at *22 (internal citations omitted).

[138] *Lanzi v. Brooks*, 388 N.Y.S.2d 946, 948 (N.Y. App. Div. 1976), *aff'd*, 373 N.E.2d 278 (N.Y. 1977).

Cerberus made any false statements of material fact. Count X appears to rest entirely on statements made by J. Richard Budd and Michael J. Smith.

Although RGI attempts to characterize Mr. Budd as a "principal" of Cerberus,[139] RGI also claimed that Mr. Budd had been named President and CEO of CRE Bushkill by this time.[140] RGI fails to plead with particularity that Mr. Budd made the allegedly false representations on behalf of Cerberus, rather than on behalf of CRE Bushkill.

Similarly, RGI identified Mr. Smith as the Vice President of Club Exploria.[141] Although Mr. Smith allegedly acknowledged that he made certain representations "on behalf of both Club Exploria and Cerberus,"[142] RGI does not plead with particularity which of Mr. Smith's statements should be credited to Cerberus. In short, RGI relies on vague, imprecise allegations to connect Cerberus with some allegedly false statements. This is insufficient to plead fraudulent inducement by Cerberus with particularity.

Finally, given the fatal deficiencies just noted, the Court need not decide whether the fraud claims are barred by merger clauses in the relevant contracts as Cerberus suggested in its 12(b)(6) Motion. Cerberus's 12(b)(6) Motion is **GRANTED** as to

---

[139] RGI's Amended Counterclaims and Third-Party Complaint at ¶ 429.

[140] *Id.* at ¶ 85.

[141] *Id.* at ¶ 429.

[142] *Id.* at ¶ 228.

Counts IX and X for want of the particularity required for such claims.

### F. THE CIVIL CONSPIRACY CLAIM FAILS (COUNT XI)

Count XI is a claim for civil conspiracy.[143]  RGI alleges the Cerberus entities, the CRE entities, and Club Exploria conspired together to "defraud RGI and tortiously interfere with RGI's contracts."[144]  As support, RGI cites "the relationship of the Cerberus-CRE Defendants, including their overlapping directors and officers, Cerberus's control of the Cerberus-CRE Defendants, and the CRE Subsidiaries actions for the benefit of Cerberus and Club Exploria and to their own detriment."[145]

In its 12(b)(6) Motion, Cerberus argues that RGI's allegations are insufficient to state a claim for civil conspiracy.  To state a claim for civil conspiracy in Delaware, a plaintiff must plead facts supporting (1) the existence of a confederation or combination of two or more persons, (2) that an unlawful act was done in furtherance of the conspiracy, and, (3) that the conspirators caused actual damage to the plaintiff.[146]  Similarly, in New York, the plaintiff must "demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the

---

[143]  RGI's Am. Countercl. and Third-Party Compl. at ¶¶ 440–45.

[144]  *Id.* at ¶ 441.

[145]  *Id.*

[146]  *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1037 (Del. Ch. 2006) (internal citations omitted).

furtherance of a plan or purpose; and (4) resulting damage or injury."[147] Here, Cerberus argues that RGI's conclusory allegation of a conspiracy is insufficient under both New York and Delaware law. Cerberus adds that RGI's conspiracy claim must fail because RGI has not adequately pleaded its underlying claims of tortious interference and fraudulent inducement. Just so.

"New York does not recognize civil conspiracy to commit a tort as an independent cause of action."[148] "[R]ather, such a claim stands or falls with the underlying tort."[149] Thus, where the underlying tort claims have been dismissed, the conspiracy claim that they might support must be dismissed too.[150] The same is true under Delaware law: if a plaintiff "fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed."[151] Here, the underlying claims are the claims for tortious interference and fraudulent inducement. Because those claims fail, the civil conspiracy claim does too.

Even if the underlying tort claims were to survive, the conspiracy claim still

---

[147] *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (N.Y. App. Div. 2010).

[148] *Com. Realty Servs. of Long Island, Inc. v. Mehran Enterprises, Ltd.*, 149 N.Y.S.3d 493, 497 (N.Y. App. Div. 2021) (internal quotations and citations omitted).

[149] *Id.* (internal quotations and citations omitted).

[150] *See id.* ("Here, the fraud cause of action was dismissed by the Supreme Court and, as set forth above, the tortious interference with contract cause of action also should have been dismissed. As such, there remains no underlying tort upon which a conspiracy cause of action could be based. Thus, the cause of action alleging conspiracy should have been dismissed.").

[151] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009).

would fail to state a claim.  RGI pleaded no facts supporting either the existence of a conspiracy or an overt act in furtherance of the conspiracy.  Instead, RGI rests its claim on the mere fact that Cerberus and CRE are closely affiliated through their corporate structure.  But that was not enough for RGI to state a claim for tortious interference, and it is not enough to state a claim for civil conspiracy either.[152]

Thus, Cerberus's 12(b)(6) Motion is **GRANTED** as to Count XI.

## V. CONCLUSION

The 12(b)(6) Motions are **DENIED** as to RGI's claim for breach of the UAPA (Count I) and the implied covenant claims as it relates to the UAPA (Count VI).  The 12(b)(6) Motions are **GRANTED** as to every other claim.  The non-UAPA contract claims (Count II–V) are dismissed to avoid duplicative litigation and the risk of inconsistent judgments arising from the adjudication of those claims in the New York Action.  And dismissal of those non-UAPA contract claims is with prejudice based on RGI's previous representations to this Court.  The claims for tortious interference (Counts VII and VIII), fraudulent inducement (Counts IX and X), and civil conspiracy (Count X) are dismissed because RGI has failed to plead facts supporting the requisite

---

[152] *See Kovkov v. L. Firm of Dayrel Sewell, PLLC*, 119 N.Y.S.3d 849, 850 (N.Y. App. Div. 2020) (affirming dismissal of civil conspiracy claim because "[b]are, conclusory allegations of conspiracy are insufficient"); *Encite LLC v. Soni*, 2008 WL 2973015, at *11 (Del.  Ch. Aug. 1, 2008) (dismissing civil conspiracy claim; "[s]imply alleging that [defendants] acted in concert . . . does not make it so").

elements of each claim. Finally, RGI's Stay Motion is **DENIED**—the non-UAPA

claims are dismissed with prejudice, rather than stayed or dismissed without prejudice.

> **IT IS SO ORDERED**.

/s/ *Paul R. Wallace*

_____

Paul R. Wallace, Judge

Original to Prothonotary